## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

BOSTON BIT LABS, INC., d/b/a BIT BAR
SALEM, a Massachusetts corporation,

               Plaintiff,

               v.

CHARLES D. BAKER, in his official capacity as
Governor of the Commonwealth of Massachusetts,

               Defendant.

CIVIL ACTION
NO. 1:20-cv-11641-RGS

## DEFENDANT'S CONSOLIDATED MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

MAURA HEALEY
ATTORNEY GENERAL

LaRonica K. Lightfoot (BBO No. 569350)
Assistant Attorney General
Government Bureau
One Ashburton Place
Boston, MA 02108
(617) 963-2357
laronica.lightfoot@mass.gov

Date:   October 13, 2020

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 4

FACTUAL AND PROCEDURAL BACKGROUND.................................................. 6

    The Governor's Orders Temporarily Closing Non-Essential Businesses........................... 6

    The Phased Reopening of the Massachusetts Economy .................................... 8

    Bit Bar's Complaint and Preliminary Injunction ............................................. 10

ARGUMENT ...................................................................................................... 10

I.     THIS COURT LACKS JURISDICTION OVER BIT BAR'S
       CLAIMS FOR INJUNCTIVE AND DECLARATORY RELIEF
       BECAUSE THE CLAIMS HAVE BECOME MOOT.................................... 11

       A.    Bit Bar's Claims for Injunctive and Declaratory Relief
              Are Moot and Must be Dismissed ....................................... 11

       B.    Bit Bar's Claims Are Neither Capable of Repetition, Yet
              Evading Review, Nor Subject to the Voluntary Cessation Doctrine ...................... 13

II.    BIT BAR'S CLAIMS AGAINST THE GOVERNOR ARE BARRED
       BY THE ELEVENTH AMENDMENT BECAUSE BIT BAR DID NOT
       ALLEGE ANY CONTINUING VIOLATION OF FEDERAL LAW ........................... 16

III.   BIT BAR'S LEGAL CLAIMS ARE ALSO WITHOUT MERIT.................................. 18

          A.    Standard of Review.................................................................. 18

          B.    The Governor Is Entitled to Broad Deference and Wide
              Latitude in Coordinating the Commonwealth's Public
              Health Response to the Global Health Pandemic. .................................... 19

          C.    Bit Bar Fails to Establish a Likelihood of Success on the
              Merits of Its Challenges to Order 43......................................... 21

          1.    Order 43 did not deny Bit Bar's First Amendment right
              to freedom of speech by temporarily prohibiting the
              operation of video games in its arcade...................................... 21

          2.    Order 43 did not violate the Equal Protection Clause
              because Bit Bar does not belong to a suspect class
              and the State has a legitimate interest in protecting
              the public health............................................................ 25

3.      Bit Bar cannot succeed on the merits of its due process claims. .............. 30

D.      The Balance of Hardships and the Public Interest
        Strongly Favor Upholding the Governor's Order 43 ............................................34

CONCLUSION.................................................................................................................... 35

This Memorandum of Law is in support of defendant's motion to dismiss and in opposition to plaintiff's motion for preliminary injunction. The central focus of defendant's combined argument detailed below is based on arcades having been allowed to reopen in Massachusetts, which rendered plaintiff's claims moot.

## INTRODUCTION

During the most acute phase of the coronavirus ("COVID-19") pandemic in Massachusetts, when the number of new cases and deaths from the disease were surging and the Commonwealth faced a risk that healthcare facilities would be overwhelmed by COVID-19 patients, defendant Governor Charles D. Baker issued a number of emergency orders to protect Massachusetts residents from the novel virus and stem its transmission in the Commonwealth. On March 23, 2020, Governor Baker issued COVID-19 Order No. 13, which required all "non-essential" businesses in Massachusetts to temporarily close their "brick-and-mortar" premises; the temporary closure of non-essential businesses, initially in effect until April 7, was extended by subsequent orders to May 19. On May 18, citing "recent public health data indicat[ing] improvement in key areas of measurement," Governor Baker issued Order 33, setting forth a four-phase plan for reopening those businesses and organizations that had previously been required to close their physical premises. In addition to Order 33, which focused on the first reopening phase, the Governor soon thereafter issued Orders 35, 37, and 43, which governed Phases II, III, and IV of the reopening process.

Of particular relevance to plaintiff's motion for preliminary injunction, Order 37, issued on June 6, which announced the reopening of Phase II entities (beginning on June 8), also identified, in an attached "Schedule A," those entities that would be permitted to reopen in the

future in Phase III, including casinos, museums, performance halls, and arcades.  The order specified that this "listing [of Phase III entities] "is subject to amendment."  In Order 43, which the Governor issued on July 2, several entities previously identified as "Phase III" entities were instead now identified as "Phase IV" entities, including arcades and overnight camps.

Plaintiff Boston Bit Labs, Inc., doing business as Bit Bar Salem, filed this action on September 2, challenging Order 43 insofar as it identified arcades as a Phase IV entity that were not yet permitted to reopen while identifying casinos as an entity that could open in Phase III (on July 6).  Bit Bar alleged that Order 43 violated its constitutional rights to procedural and substantive due process, free speech, and equal protection.  On September 10, Governor Baker issued Order 50, which made certain adjustments to the orders governing entities permitted to reopen in Phase III, including by extending outdoor dining, and authorizing indoor and outdoor gaming arcades to open their brick-and-mortar premises on September 17, as long as they complied with generally applicable social distancing and safety measures set forth in sector-specific standards to be issued by the Department of Labor Standards.

Because arcades have been allowed to reopen as of September 17, pursuant to Order 50, Bit Bar's claims are moot.  Bit Bar's claims for declaratory and injunctive relief, as well as its claim for damages, likewise are barred by the Eleventh Amendment.  And, all of Bit Bar's claims fail as a matter of law, because Order 43, designed to protect the health and safety of Massachusetts residents, is constitutional.  Bit Bar accordingly has no likelihood of success on the merits of its injunctive claims, and the public interest weighs powerfully in favor of sustaining the Orders during the pandemic, as courts across the country have recognized in

deferring to executive orders by state elected officials to close non-essential businesses.[1]  The Court accordingly should deny Bit Bar's motion for preliminary injunction and dismiss the complaint.

## FACTUAL AND PROCEDURAL BACKGROUND

### The Governor's Orders Temporarily Closing Non-Essential Businesses

On March 10, 2020, Governor Baker declared a State of Emergency in Massachusetts due to the spread of the novel coronavirus.[2]  When the Governor issued the emergency declaration, Massachusetts had 91 confirmed COVID-19 cases and no confirmed deaths.[3]  As of the date of the filing of this motion, more than 136,000 Massachusetts residents have been confirmed infected with the coronavirus, and over 9,300 residents have died from the disease.[4]

To stall the spread of the virus and prevent healthcare facilities from becoming overwhelmed with COVID-19 patients during the height of the pandemic, government officials,

---

[1]    *See, e.g., League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer*,  2020 WL 3468281, at *1 (6th Cir. June 24, 2020) (staying lower court injunction involving reopening of fitness centers); *McCarthy v. Cuomo*, 2020 WL 3286530, at *6 (E.D.N.Y. June 18, 2020) (denying preliminary injunction concerning closure of bars); *Cassell v. Snyders*, 2020 WL 2112374, at *11 (N.D. Ill. May 3, 2020) (denying preliminary injunction concerning closure of churches); *CommCan, Inc. v. Baker*,  2020 WL 1903822, at *7 (Mass. Super. Apr. 16, 2020) (concluding that the Governor's COVID-19 Orders "are within the scope of the Governor's broad emergency powers"); *World Gym, Inc. v. Baker*, 2020 WL 4274557, at *2-3 (D. Mass. 2020) (denying as moot plaintiffs' motions for relief to enjoin Governor's order closing fitness facilities as non-essential businesses).

[2]    *See* Governor's Declaration of Emergency (March 10, 2020), https://www.mass.gov/news/declaration-of-a-state-of-emergency-to-respond-to-covid-19 (declaring state of emergency in accordance with Mass. St. 1950, c. 639 and Mass. Gen. Laws c. 17, § 2A); Addendum 037.

[3]    *See id.*

[4]    Massachusetts Dep't of Public Health, COVID-19 Dashboard (October 11, 2020), https://www.mass.gov/doc/covid-19-dashboard-october-11-2020/download.

including those in Massachusetts, temporarily closed forums in which people assemble.  And, in Massachusetts, Governor Baker ordered a host of measures to promote social distancing.

By March 23, when Massachusetts had 646 confirmed COVID-19 cases and five deaths, Governor Baker issued Order 13, which authorized essential services - like those involved in distribution of food, provision of medical care, and law enforcement - to continue operating, but required all other businesses to close temporarily until April 7.[5]  Businesses spanning diverse sectors of the economy, from bookstores, to barbershops, to clothing stores, and, as relevant here, arcades, were not included among the list of essential services.  The Order also temporarily prohibited gatherings of more than 10 people anywhere in the Commonwealth, including for community, civic, personal, or other events.[6]

Following Order 13, the number of COVID-19 cases and deaths in Massachusetts spiked dramatically, causing the Governor to twice extend Order No. 13, first to May 4 and then to May 18.[7]  During the period in which Order 13 was effective, arcades were never designated as an essential service.[8]

---

[5]     *See* Order 13, Order Assuring Continued Operation of Essential Services in the Commonwealth, Closing Certain Workplaces, and Prohibiting Gatherings of More Than 10 People (March 23, 2020), https://www.mass.gov/doc/march-23-2020-essential-services-and-revised-gatherings-order/download.; A038.

[6]     *Id.*

[7]     *See* Order 21, Order Extending the Closing of Certain Workplaces and the Prohibition on Gatherings of More Than 10 People (March 31, 2020), https://www.mass.gov/doc/march-31-2020-essential-services-extension-order/download.  *See* Order 30, Order Further Extending the Closing of Certain Workplaces and the Prohibition on Gatherings of More than 10 People (April 28, 2020), https://www.mass.gov/doc/signed-second-extension-of-essential-services-order/download.

[8]     COVID-19 Essential Services: Exhibit A of the Order of the Governor Assuring Continued Operation of Essential Services in the Commonwealth, Closing Certain Workplaces and Prohibiting Gatherings of More Than 10 People (as updated March 31, 2020), https://www.mass.gov/doc/march-31-essential-services-list/download.

**The Phased Reopening of the Massachusetts Economy**

By the middle of May, likely due in large part to the social distancing measures implemented statewide, the number of new daily coronavirus infections and deaths had plateaued and then begun steadily decreasing.  On May 18, as noted above, Governor Baker announced a new slate of measures that began the process of reopening the Massachusetts economy.[9]  Under the Governor's phased approach, sectors of the Massachusetts economy would reopen in four phases, with the timeline of the reopening guided by key public health metrics.[10]

Order 33, issued on May 18, governed the first phase of the reopening process for a variety of businesses.[11]  Under Order 33, those entities previously deemed "essential services" could continue to operate from their brick-and-mortar premises.  In addition, Order 33 identified certain additional businesses and organizations, including manufacturing and construction operations, which were authorized to open to the public during "Phase I" of the reopening, beginning on May 18, subject to the general workplace safety rules set forth in Order 33 and sector-specific rules issued by DLS.[12]  These general workspace safety rules included social distancing, hygiene, staffing, and cleaning requirements.[13]  On June 1, Governor Baker issued Order 35, identifying those entities allowed to reopen their physical premises in Phase II,

---

[9]      *See* Press Release, *Reopening Massachusetts: Baker-Polito Administration Initiates Transition to First Phase of Four-Phase Approach* (May 18, 2020), https://www.mass.gov/news/reopening-massachusetts-baker-polito-administration-initiates-transition-to-first-phase-of.

[10]     *See id.*

[11]     *See* Order 33, Order Implementing a Phased Reopening of Workplaces and Imposing Workplace Safety Measures to Address COVID-19 (May 18, 2020), https://www.mass.gov/doc/may-18-2020-re-opening-massachusetts-order/download; A043.

[12]     *Id.*

[13]     *See id.*

8

beginning on June 8 (such as restaurants, libraries, schools, and funeral homes), subject to general workplace safety rules and sector-specific rules issued by DLS; it also identified those entities that would be allowed to reopen in future Phases III and IV.[14]  Order 35 identified casino gaming floors and indoor recreational businesses, such as arcades, as Phase III entities, noting, however, that "[t]his listing is subject to amendment."[15]

On July 2, the Governor issued Order 43, which announced the reopening of Phase III entities on July 6 (or, if in Boston, on July 13).  As noted above, under Order 43, casinos were identified as a Phase III entity, while indoor and outdoor arcades were identified as a Phase IV entity.[16]  However, on September 10, Governor Baker issued Order 50, which made certain adjustments to the orders governing Phase III entities, including by amending Order 43 so as to allow indoor and outdoor gaming arcades to open on September 17 (during Phase III), subject to sector-specific safety standards issued by DLS.[17]  As a result of issuance of Order 50, Bit Bar has been allowed to operate its arcade since September 17.

---

[14]     *See* Order 35, Order Clarifying the Progression of the Commonwealth's Phased Workplace Re-opening Plan and Authorizing Certain Re-opening Preparations at Phase II Workplaces (June 1, 2020), https://www.mass.gov/doc/order-preparing-for-phase-ii-reopening/download.

[15]     *See id.; see also* https://www.mass.gov/info-details/reopening-when-can-my-business-reopen#businesses- (listing "arcades and casinos" in the group of businesses scheduled to reopen in Phase III).

[16]     *See* Order 43, Order Authorizing the Re-opening of Phase III Enterprises (July 2, 2020), https://www.mass.gov/doc/phase-3-order-july-2-2020/download; A062; Charles D. Baker, Order 44, Second Revised Order Regulating Gatherings Throughout the Commonwealth (July 2, 2020), https://www.mass.gov/doc/revised-gatherings-order-july-2-2020/download.

[17]     *See* Order 50, Order Making Certain Phase III Adjustments (September 10, 2020), https://www.mass.gov/doc/september-10-2020-order-making-certain-phase-iii-adjustments/download; A071.

**Bit Bar's Complaint and Preliminary Injunction**

On September 2, 2020, Bit Bar filed suit to challenge the Governor's Order 43, as it applied to Bit Bar's gaming arcade portion of its business.  *See generally* Complaint ("Compl."). Naming Governor Baker in his official capacity as the sole defendant, Bit Bar alleged that the now-lifted order temporarily closing its arcade portion of its business, but permitting the opening of casinos under Phase III, violated the Free Speech, Due Process, and Equal Protection Clauses of the United States Constitution.  Compl. at pp. 6-7.  Bit Bar also moved for a preliminary injunction effectively allowing it to reopen its arcade immediately (by forbidding the Governor from enforcing any restrictions beyond those imposed on Phase III enterprises), a change that has now already occurred due to issuance of Order 50, allowing all arcades in the Commonwealth to open as of September 17.  ECF No. 3.  Bit Bar also seeks damages for past business losses and attorneys' fees and costs.  Compl. at Prayer for Relief.

## ARGUMENT

While a live dispute existed between the parties when the complaint was filed, there no longer exists any controversy because, since September 17, following the issuance of Order 50, which made certain Phase III adjustments, Bit Bar has been allowed to operate its arcade portion of its business.  All of Bit Bar's claims are therefore moot, and the Court accordingly should deny preliminary injunctive relief and dismiss the complaint for lack of subject-matter jurisdiction.  Beyond the threshold issue of mootness, this Court should also dismiss the complaint because all of the relief sought by Bit Bar - its claim for declaratory and injunctive relief, as well as its official-capacity damages claims against Governor Baker - are barred by the Eleventh Amendment.  Finally, Bit Bar's procedural due process, free speech, and equal protection claims all are lacking in merit and thus should be dismissed for failure to state a claim.

10

I.   **THIS COURT LACKS JURISDICTION OVER BIT BAR'S CLAIMS FOR INJUNCTIVE AND DECLARATORY RELIEF BECAUSE THE CLAIMS HAVE BECOME MOOT.**

A.   **Bit Bar's Claims for Injunctive and Declaratory Relief Are Moot and Must be Dismissed.**

This Court's jurisdiction under Article III extends only to "Cases" and "Controversies." U.S. Const. Art. III, § 2, cl. 1.  A lawsuit becomes moot - and thus no longer a case or controversy subject to federal court jurisdiction - when "the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome."  *Am. Civil Liberties Union of Mass. v. U.S. Conference of Catholic Bishops*, 705 F.3d 44, 52 (1st Cir. 2013) ("*ACLUM*") (quoting *D.H.L. Assocs., Inc. v. O'Gorman*, 199 F.3d 50, 54 (1st Cir. 1999)  "Another way of putting this is that a case is moot when the court cannot give any 'effectual relief' to the potentially prevailing party."  *Id.* (quoting *Horizon Bank & Trust Co. v. Massachusetts*, 391 F.3d 48, 53 (1st Cir. 2004).  To remain subject to federal court jurisdiction, "a dispute 'must be extant at all stages of review, not merely at the time the complaint is filed.'"  *United States v. Sanchez-Gomez*, __ U.S. __, 138 S. Ct. 1532, 1537 (2018) (quoting *Preiser v. Newkirk,* 422 U.S. 395, 401 (1975)).  "This requirement ensures that the Federal Judiciary confines itself to its constitutionally limited role of adjudicating actual and concrete disputes, the resolutions of which have direct consequences on the parties involved."  *Genesis HealthCare Corp. v. Symczyk*, 569 U.S. 66, 71 (2013).

Bit Bar brought suit to challenge Order 43 insofar as it temporarily prohibited arcades from opening during the spread of COVID-19 infection in Massachusetts.  This order has now been superseded.  As of September 17, arcades, like the one operated by Bit Bar in its business facility, are now fully authorized by the Governor to open pursuant to Order 50, subject to

general social distancing, hygiene, and sanitation requirements imposed on all such organizations in Massachusetts, as supplemented by sector-specific standards, applicable to arcades in particular, issued by DLS.[18]

Because this Court can give no "effectual relief" to Bit Bar with respect to its request that its arcade portion of its business be allowed to reopen, the claim here for injunctive relief is now moot.  Since there is literally nothing left to enjoin, at a minimum plaintiff's motion for preliminary injunction must be denied as moot.  *ACLUM*, 705 F.3d at 52; *see also Davidson v. Howe*, 749 F.3d 21, 26 (1st Cir. 2014) (case is moot because "when a challenged [administrative] plan goes out of effect, there is literally no controversy left for the court to decide—the case is no longer live.  More still, a court can provide no meaningful relief to the challenging party since, once the plan ceases to be operative, there is no plan left to enjoin" (internal citations and quotation marks omitted)); *United States v. Reid*, 369 F.3d 619, 624-26 (1st Cir. 2004) (request for injunctive relief on constitutional claims rendered moot by expiration of the administrative order creating the basis for the plaintiff's asserted constitutional deprivation).

Nor would Bit Bar be entitled to issuance of a declaratory judgment deeming past conduct violative of the Constitution, because such a declaration would be merely advisory.  *See ACLUM*, 705 F.3d at 53.  As the First Circuit has explained, "it would be pointless to either enjoin the enforcement of a regulation that is no longer in effect or to declare its constitutional status."  *New England Reg'l Council of Carpenters v. Kinton*, 284 F.3d 9, 18 (1st Cir. 2002); *see*

---

[18]     *See* 454 Code Mass. Regs. § 31.00, COVID-19 Workplace Safety Regulations; *see also* https://www.mass.gov/resource/reopening-sector-specific-protocols-and-best-practices (setting forth reopening:  sector-specific protocols and best practices for arcades and other nonessential businesses).

*also Spencer v. Kemna*, 523 U.S. 1, 18 (1998) (the federal courts are not "in the business of pronouncing that past actions which have no demonstrable continuing effect were right or wrong"). Such relief, in the form of a backward-looking declaration, would also violate the Eleventh Amendment.

**B.  Bit Bar's Claims Are Neither Capable of Repetition, Yet Evading Review, Nor Subject to the Voluntary Cessation Doctrine.**

None of the exceptions to the mootness doctrine applies here. First, Bit Bar's claims do not challenge conduct that is, by its nature, "capable of repetition yet evading review." "The capable-of-repetition doctrine applies only in exceptional situations," *City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983), "where a plaintiff can show that '(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subject to the same action again.'" *ACLUM*, 705 F.3d at 57 (quoting *Gulf of Me. Fisherman's Alliance v. Daley*, 292 F.3d 84, 89 (1st Cir. 2002)). Bit Bar cannot satisfy either prong.

As to the first prong of this test, Bit Bar did not initiate this litigation until September 2, nearly *six months* after the Governor's orders temporarily closing arcades and other non-essential businesses went into effect. "The capable-of-repetition doctrine is not meant to save mooted cases that may have remained live but for the neglect of the plaintiff." *Newdow v. Roberts*, 603 F.3d 1002, 1009 (D.C. Cir. 2010). This suit was only filed when it became clear that the Commonwealth was already reopening businesses in phases and casinos would be permitted to reopen. Bit Bar should not be able to seek the refuge of this exception to the mootness doctrine merely because it waited months until the process of reopening businesses in the Commonwealth was underway. *See ACLUM*, 705 F.3d at 57 (rejecting application of capable-of-repetition-yet-

evading-review exception where alleged misconduct "could have been challenged much earlier"); *see also World Gym*, 2020 WL 4274557, at \*2 (noting plaintiffs waited three months to challenge the Governor's order closing fitness facilities and concluding that the capable-of-repetition-yet-evading review doctrine did not apply).

Bit Bar also cannot satisfy the second prong of this test, because it cannot establish a "reasonable expectation" or "demonstrated probability" that Governor Baker will issue a future order temporarily closing arcades, while reopening casinos, in order to protect public health from another severe outbreak of the coronavirus. *ACLUM*, 705 F.3d at 57.  Although Bit Bar may speculate about a new wave of infections that might necessitate another temporary closure of arcades in Massachusetts, its argument would be just that: speculation.  It would depend on speculation that (1) there will be another statewide outbreak of COVID-19 requiring a statewide response, as opposed to a more targeted or local response, even though social distancing and related public health measures remain in place in order to prevent such an occurrence; (2) that the Governor would respond to such an outbreak with the same order requiring a broad range of businesses statewide, including arcades, to close temporarily in order to contain the new outbreak; and (3) that casinos would be permitted to reopen while arcades remained closed under a phased reopening plan.  *See Davidson*, 749 F.3d at 26-27 (capable-of-repetition-yet-evading-review doctrine requires a reasonable expectation that the same complaining party would be subject to the same "alleged illegality").  Such speculation about events that might or might not come to pass is insufficient to save moot claims from dismissal under the capable-of-repetition-yet-evading-review exception to mootness.  *See Newspaper Guild of Salem, Local 105 of the Newspaper Guild v. Ottaway Newspapers, Inc.*, 79 F.3d 1273, 1278 (1st Cir. 1996) ("a mere speculative possibility of repetition of the challenged conduct cannot avoid application of the

14

mootness doctrine") (citing *Williams v. Alioto*, 549 F.2d 136, 143 (9th Cir. 1977); *see also World Gym*, 2020 WL 4274557, at *2 (concluding that plaintiffs could not establish "reasonable expectation" or "demonstrated probability" that the Governor would issue a future order closing all fitness facilities).

Second, this case is not one in which a defendant's voluntary cessation of the challenged conduct saves moot claims from dismissal. The voluntary cessation doctrine has no applicability here because the phased reopening (which began on May 18, pursuant to Order 33) has been in operation since well before this suit was filed – and there is no "reasonable expectation that the challenged conduct will be repeated following dismissal of the case." *Town of Portsmouth v. Lewis*, 813 F.3d 54, 59 (1st Cir. 2016) (quoting *ACLUM*, 705 F.3d at 54, 56) (internal citations and alterations omitted). The "purpose" of the doctrine "is to deter a 'manipulative litigant from immunizing itself from suit indefinitely, altering its behavior long enough to secure a dismissal and then reinstating it immediately thereafter.'" *Id.* (quoting *ACLUM*, 705 F.3d at 54-55) (internal alterations omitted). Here, there is no "reasonable expectation that the challenged conduct [reopening casinos in a phase before reopening arcades] will be repeated following dismissal of the case." *ACLUM*, 705 F.3d at 56; *see also Town of Portsmouth*, 813 F.3d at 59. There also is no indication at present that Massachusetts will have to reinstate the more restrictive initial measures that had to be taken at the very outset of the outbreak, in March 2020.

In comparable circumstances, the First Circuit has concluded that the voluntary cessation doctrine does not justify retaining jurisdiction over claims for injunctive and declaratory relief. For example, in *New England Regional Council of Carpenters v. Kinton*, the defendant agency Massport updated its prior policy prohibiting leafletting on Northern Avenue in Boston with new regulations that allowed leafletting under certain circumstances. 284 F.3d at 15-17. The court

held that the voluntary cessation doctrine did not save claims challenging the prior policy as applied because "there [was] simply no basis for suggesting that the original permit policy [would] be reinstated following the conclusion of litigation."  *Id*. at 18; *see id.* at 18 n.3 ("Given the circumstances of this case, we think it wise to avoid an adjudication addressed to a policy that no longer applies at the site in question").  The same conclusion applies in this case.  Order 50 reclassified arcade businesses as Phase III enterprises, which were permitted to reopen on September 17, as long as they complied with generally applicable social distancing and safety measures set forth in DLS's sector-specific standards.  There is no basis to conclude that Order 43, to the extent it permitted casinos to reopen and delayed reopening arcades, would be reissued after this case is concluded.

For these reasons, all of Bit Bar's claims for injunctive and declaratory relief challenging Order 43 are moot and should be dismissed for lack of jurisdiction.

## II.     BIT BAR'S CLAIMS AGAINST THE GOVERNOR ARE BARRED BY THE ELEVENTH AMENDMENT BECAUSE BIT BAR DID NOT ALLEGE ANY CONTINUING VIOLATION OF FEDERAL LAW.

As noted above, Bit Bar seeks a declaration that Governor Baker's issuance of Order 43, identifying arcades as Phase IV instead of Phase III enterprises, violated the First and Fourteenth Amendments of the U.S. Constitution.  Compl., Prayer for Relief.  But because Bit Bar has been allowed to open its arcade business as of September 17, pursuant to Order 50, and because the Order classifies arcade businesses as Phase III enterprises, Bit Bar does not – and cannot – allege any continuing violation of federal law allegedly resulting from Order 43.  In these circumstances, the Eleventh Amendment bars the declaratory or injunctive relief that Bit Bar seeks against the Governor.  *See Green v. Mansour*, 474 U.S. 64, 71-73 (1985) (Eleventh Amendment bars declaratory relief against a state official in the absence of a "continuing

16

violation of federal law"; and plaintiffs thus were not entitled to a declaration that the respondent

state official's prior conduct violated federal law; similarly, "[b]ecause there is no continuing

violation of federal law to enjoin in this case, an injunction is not available").[19]  *See also Mills v.*

*Maine*, 118 F.3d 37, 55 (1st Cir. 1997) (same).

Bit Bar's claims for damages against the Governor likewise are barred by the Eleventh

Amendment.  "[A] suit by private parties seeking to impose a liability which must be paid from

public funds in the state treasury is barred by the Eleventh Amendment."  *Edelman v. Jordan*,

415 U.S. 651, 663 (1974).  Thus, "the Eleventh Amendment bars the award by a federal court of

retroactive relief in the form of money damages payable from the state treasury."  *Doucette v.*

*Ives*, 947 F.2d 21, 29 (1st Cir. 1991).  The foregoing rule applies to suits against the state itself as

well as to suits against state officials sued in their official capacities.  *See, e.g., Mills v. Maine*,

118 F.3d at 54 (discussing *Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89, 102-

103 (1984)).  Bit Bar's damages claims, asserted against the Governor in his official capacity,

accordingly should be dismissed for lack of subject matter jurisdiction, pursuant to Fed. R. Civ.

P. 12(b)(1).

---

[19]  As the Court explained, a declaratory judgment concerning the lawfulness of a state official's past actions "would have much the same effect as a full-fledged award of damages or restitution by the federal court, the latter kinds of relief being of course prohibited by the Eleventh Amendment."  *Green v. Mansour*, 474 U.S. at 73.  As the Court further explained, "a declaratory judgment is not available when the result would be a partial 'end run' around our decision in *Edelman v. Jordan*."  *Green v. Mansour, id.; see also id.* at 69-70 (explaining that in *Edelman v. Jordan*, 415 U.S. at 666-69, the Court had previously held that an injunction ordering retroactive benefits under a federal-state aid program "was effectively an award of money damages for past violations of federal law" and thus was barred by the Eleventh Amendment).

III.     **BIT BAR'S LEGAL CLAIMS ARE ALSO WITHOUT MERIT.**

   A.  **Standard of Review.**

   The Court should deny the motion for preliminary injunction for the further reason that

Bit Bar's claims fail as a matter of law, and, moreover, Bit Bar does not meet the other

requirements for injunctive relief.  A preliminary injunction "is never awarded as of right."

*Munaf v. Geren*, 553 U.S. 674, 690 (2008).  Rather, Bit Bar must establish that it is likely to

succeed on the merits, that it is likely to suffer irreparable harm in the absence of preliminary

relief, that the balance of equities tips in its favor, and that an injunction is in the public interest.

*See Díaz-Carrasquillo v. García-Padilla*, 750 F.3d 7, 10 (1st Cir. 2014) (outlining four elements

for consideration of motion for preliminary injunction).  The last two factors "merge when the

Government is the opposing party."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  The first factor

– likelihood of success on the merits – is the "'sine qua non' of a preliminary injunction."

*Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc.*, 794 F.3d 168, 173 (1st Cir. 2015)

(citations omitted).  Because Bit Bar cannot carry its substantial burden to make a "clear

showing," *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997), that it is entitled to preliminary

injunctive relief, its motion should be denied.

   In addition, to avoid dismissal under Fed. R. Civ. P. 12(b)(6), a complaint must allege

facts sufficient to "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 555 (2007).  The Court need not accept as true "[t]hreadbare recitals of

the elements of a cause of action, supported by mere conclusory statements."  *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009).  Dismissal is appropriate if the well-pleaded facts do not "possess

enough heft" to show an entitlement to relief.  *Ruiz Rivera v. Pfizer Pharm., LLC*, 521 F.3d 76,

84 (1st Cir. 2008).  Because Bit Bar's complaint does not meet the foregoing standard, the Court

should also dismiss the complaint for failure to state a claim upon which relief can be granted.

**B.   The Governor Is Entitled to Broad Deference and Wide Latitude in Coordinating the Commonwealth's Public Health Response to the Global Health Pandemic.**

Over a century of controlling precedent establishes that Bit Bar's individual rights claims

must yield to the Governor's paramount responsibility to protect the Commonwealth's residents

against the COVID-19 global pandemic.  The Supreme Court has long recognized that a

"community has the right to protect itself against an epidemic of disease which threatens the

safety of its members."  *Jacobson v. Massachusetts*, 197 U.S 11, 27 (1905) (rejecting

constitutional challenge to compulsory vaccination requirement imposed by the City of

Cambridge during a smallpox outbreak) (internal quotation marks omitted); *see also Compagnie*

*Francaise de Navigation a Vapeur v. La. State Bd. of Health*, 186 U.S. 380, 387 (1902) (state

authority "to enact and enforce quarantine laws for the safety and protection of the health of their

inhabitants … is beyond question.").

Under *Jacobson*, the "liberty secured by the Constitution … does not import an absolute

right in each person to be, at all times and in all circumstances, wholly freed from restraint,"

particularly during a global pandemic like this one when cooperative action is necessary for the

common good. 197 U.S. at 26; *see also id*. at 29 ("in every well-ordered society charged with the

duty of conserving the safety of its members the rights of the individual in respect of his liberty

may at times, under the pressure of the great dangers," be subject to reasonable regulation "as the

safety of the general public may demand").  *Jacobson* thus instructs that state action should be

upheld unless it lacks a "real or substantial relation to the protection of the public health" or

represents "a plain, palpable invasion of rights secured by the fundamental law."  *Id*. at 31.

Courts reviewing emergency challenges to governor-issued orders temporarily restricting activities to curb the spread of COVID-19 have consistently applied *Jacobson* to evaluate those challenges. Most significantly, the Supreme Court recently upheld the denial of a request to enjoin California's guidelines imposing capacity limitations on places of worship, with Chief Justice Roberts confirming in a concurring opinion that, under *Jacobson*, government officials must have broad authority and wide latitude to safeguard the "safety and health of the people" from COVID-19. *South Bay United Pentecostal Church v. Newsom* ("*South Bay*"), __ U.S. __, 140 S. Ct. 1613, 1613 (May 29, 2020) (Roberts, C.J., concurring in the denial of application for injunctive relief) (quoting *Jacobson*, 197 U.S. at 38). Other courts have echoed this deferential standard. *See*, *e.g.*, *League of Indep. Fitness*, 2020 WL 3468281, at *2 (collecting cases).

*Jacobson's* deferential standard is met here. Simply put, there is a "real [and] substantial relation" between Order 43 and the "protection of the public health." *Jacobson*, 197 U.S. at 31. COVID 19 is a global pandemic and national public health emergency that has substantially affected Massachusetts residents. As of October 11, 2020, the Department of Public Health has reported 136,168 confirmed cases of the virus in the Commonwealth and 9,388 deaths attributable to the disease. *See supra* footnote 4. Moreover, it is undeniable that the disease is highly contagious, has no known cure or vaccine, and spreads from person to person via respiratory droplets when an infected person coughs or sneezes. *See South Bay*, 140 S. Ct. at 1613 (Roberts, C.J., concurring) ("there is no known cure, no effective treatment, and no vaccine"). As such, there is a "real [and] substantial relation," *Jacobson*, 197 U.S. at 31, between the problem at hand (rapid transmission of the disease by person-to-person interactions) and the Governor's measures to combat the problem, including through the temporary closure of non-essential "physical" facilities, including arcades, so as to limit contact between persons.

20

Bit Bar urges this Court to second-guess the lines drawn by Governor Baker in Order 43. But where the Commonwealth has a compelling interest in slowing the spread of COVID-19 and protecting public health, and Order 43 is rationally related to that purpose, this Court should not "usurp the functions" of the Commonwealth's elected officials by deciding the legitimacy of "the mode adopted under the sanction of the state, to protect the people at large." *Jacobson*, 197 U.S. at 28; *see South Bay*, 140 S. Ct. at 1613 (Roberts, C.J., concluding that, "[t]he precise question of when restrictions on particular social activities should be lifted during the pandemic is a dynamic and fact-intensive matter subject to reasonable disagreement," and broad latitude is afforded to elected officials) (internal quotations and citations omitted).

### C. <u>Bit Bar Fails to Establish a Likelihood of Success on the Merits of Its Challenges to Order 43.</u>

Bit Bar is unlikely to succeed on any of its constitutional claims - free speech, equal protection, or due process. Even if this Court departs from the broad deference typically afforded the Executive Branch during emergencies, which would also be a departure from *Jacobson's* deferential standard, Order 43 would readily survive scrutiny under a traditional constitutional analysis. The Court should thus deny the preliminary injunction motion and dismiss the complaint, as Bit Bar cannot succeed on its claims that Order 43 violated its individual rights.

      1. <u>Order 43 did not deny Bit Bar's First Amendment right to freedom of speech by temporarily prohibiting the operation of video games in its arcade.</u>

Order 43 is a rational measure that does not regulate speech, but serves the government's compelling interest in protecting public health during a global pandemic that has already claimed the lives of over 9,300 Massachusetts residents. Contrary to Bit Bar's contention, Order 43 neither restrained Bit Bar's "speech" for purposes of the First Amendment nor otherwise

infringed upon Bit Bar's First Amendment rights.  *See* Compl. at p. 6 (describing Bit Bar's

alleged right to operate an arcade for patrons to play video games); *see also* ECF No. 3 at p. 9,

4.1 (arguing that Bit Bar was forbidden from operating it business, with the result that customers

cannot enjoy the video games Bit Bar makes available to them).  As explained in greater detail

below, Bit Bar has failed to allege a viable First Amendment claim.

The Free Speech Clause of the First Amendment provides that "Congress shall make no

law ... abridging the freedom of speech."  U.S. Const. amend. I.  By incorporation through the

Fourteenth Amendment, "this prohibition applies [ ] to states and their political subdivisions."

*Knights of Columbus v. Town of Lexington*, 272 F.3d 25, 30 (1st Cir. 2001).  Conduct must be

"sufficiently imbued with elements of communication to fall within the scope of the First

[Amendment]."  *Spence v. State of Washington*, 418 U.S. 405, 409 (1974).  "It is the duty of the

party seeking to engage in allegedly expressive conduct to demonstrate that the First Amendment

applies to that conduct."  *Wine & Spirits Retailers, Inc. v. Rhode Island*, 418 F.3d 36, 49 (1st Cir.

2005).  "The First Amendment's core concern is with the free transmission of a message or idea

from speaker to listener, not with the speaker's ability to turn a profit …."  *Id*. at 48.  Here, Bit

Bar is not the speaker attempting to transmit a message or idea to the users of the video games.

Bit Bar did not design or program the machines in the arcade portion of its business.  By

Bit Bar's own admission, it operated an arcade that housed the video games that were actually

designed and programmed by third parties and made available by Bit Bar for use by other third

parties.  Compl. at p.6; ECF No. 3 at pp. 8, 12-13, 15.  Bit Bar's operation of its arcade offering

video games for entertainment use by its patrons is no different from a fitness facility offering

use of its gym equipment to its members, and does entitle Bit Bar to a First Amendment claim

asserting freedom of speech.  *See World Gym*, 2020 WL 4274557 (asserting only two

22

constitutional challenges - due process and equal protection - to COVID-19 orders regulating fitness centers in response to the pandemic).  Here, Order 43 did not infringe upon any speech or expressive conduct of Bit Bar that is protected by the First Amendment.  And, the prohibition on operating an arcade that would have permitted patrons to play video games in a restaurant does not implicate the First Amendment.  *See, e.g., HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 685 (9th Cir. 2019) ("Because the conduct at issue - completing booking transactions for unlawful rentals - consists only of nonspeech, nonexpressive conduct, we hold that the ordinance does not implicate the First Amendment.").

"[I]t has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed."  *U.S. v. Sayer*, 748 F.3d 425, 433 (1st Cir. 2014), quoting *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949).  *See Pitt. Press Co. v. Pitt. Comm'n on Hum. Rels.*, 413 U.S. 376, 389 (1973) (newspaper publisher challenging ordinance had no First Amendment interest in placing want ads for employment which aided employers in indicating illegal gender-based hiring preferences because the restriction on advertising was incidental to ordinance's prohibition of discrimination in employment based on gender); *see also Baptiste v. Kennealy*, 2020 WL 5751572, at *30 (D. Mass. Sept. 25, 2020) (determining that all non-essential evictions were prohibited while the moratorium on evictions during the COVID-19 emergency was in effect. "Therefore, the prohibition on sending statutory notices to quit addresses preventing unlawful conduct, which only incidentally burdens speech and is not likely to be found to violate the First Amendment.").

Here, the purpose of Order 43, and related COVID-19 orders targeted at phasing in and staggering the reopening of businesses under social distancing and established safety measures,

is to protect the safety and well-being of the people in the Commonwealth during a deadly pandemic by containing the virus.  It is noteworthy that only the arcade portion of Bit Bar's business, which involved patrons playing video games, was affected by the order and that the order was in effect only temporarily.  *See* Compl. at p. 4 (stating that the restaurant portion of plaintiff's business can open, but not the arcade).  Therefore, to the extent Order 43 may have even incidentally burdened speech, it is not likely to be found to violate the First Amendment.  *See Giboney*, 336 U.S. at 501-02; *Pitt. Press. Co.*, 413 U.S. at 389; *Baptiste*, 2020 WL 5751572, at *30.  "The First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech."  *Nat'l Inst. of Family and Life Advocates v. Becerra*, __ U.S. __, 138 S. Ct. 2361, 2373 (2018), quoting *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011).

Even if Order 43 were treated as if it regulates "speech," Bit Bar's challenge would fail nonetheless because the "speech" at issue is purely of a commercial nature, and Order No. 43's requirements fit comfortably within the standard for restricting commercial speech.  *See Central Hudson Gas & Elec. Corp. v. Pub. Svc. Comm'n of N.Y.*, 447 U.S. 557, 561 (1980) (commercial speech is "related solely to the economic interests of the speaker and its audience").  As to governmental limits on commercial speech, "intermediate scrutiny" applies:

> For commercial speech to come within th[e First Amendment], it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial.  If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

*Cent. Hudson*, 447 U.S. at 566.  Here, this test is immediately fatal to Bit Bar's claims because the Commonwealth's interest in temporarily closing businesses in order to limit transmission of a deadly disease is unquestionably "substantial."  *See id.*

In addition, there is a "reasonable fit between the means and ends" of Order 43.  *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 561 (2001).  Given the pandemic's far-reaching impact throughout Massachusetts, a temporary ban on gaming arcades, when many schools and other nonessential indoor recreational activities that attract children were closed, are reasonable measures aimed at protecting the public health.  *Sorrell*, 564 U.S. at 572.  Thus, Order 43, and associated phasing orders, easily pass muster under the test's remaining prongs.  Based on the recommendations of public health officials, the Governor could reasonably impose measures to ensure social distancing in order to reduce transmission of COVID-19.  In sum, temporary closure of arcades and other businesses advanced the State's interest in limiting the spread of COVID-19.

    2.  Order 43 did not violate the Equal Protection Clause because Bit Bar does not belong to a suspect class and the State has a legitimate interest in protecting the public health.

"Unless a classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion, or alienage," the constitutionality of the statutory discrimination is "presume[d]"and need only "be rationally related to a legitimate state interest."  *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976).  Business owners of arcades nestled within their businesses like Bit Bar's arcade are not in a "suspect" class, and regulation of business operations does not "impinge on fundamental rights."  *Levin v. Commerce Energy, Inc.*, 560 U.S. 413, 426 & n.4 (2010); A "rational basis" standard thus applies, and the orders easily meet that standard.

Bit Bar cannot prevail on its equal protection claim because it was not "similarly situated" to casinos.  "When a plaintiff alleges an equal protection violation (without also alleging discrimination based upon membership in a protected class), the plaintiff must plausibly allege that he or she has been intentionally treated differently from others similarly situated and no rational basis exists for that different treatment . . . Such a claim. . .  stems from the Equal Protection Clause's requirement that the government treat all similarly situated people alike." *Progressive Credit Union v. City of New York*, 889 F.3d 40, 49 (2d Cir. 2018).  *See also Starlight Sugar, Inc. v. Soto*, 253 F.3d 137, 45 (1st Cir. 2001).  "To succeed on such a claim, plaintiffs 'must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves.'"  *Progressive Credit Union*, 889 F.3d at 49, quoting *Clubside v. Valentin*, 467 F.3d 144, 159 (2d. Cir. 2006).  "Specifically, such a plaintiff must be 'prima facie identical' to the persons alleged to receive irrationally different treatment."  *Id*., quoting *Neilson v. D'Angelis*, 409 F.3d 100, 105 (2d. Cir. 2005) (holding taxicabs and "for hire vehicles" (e.g., Uber and Lyft) are not "prima facie identical").  "Different products or services do not as a matter of constitutional law, and indeed of common sense, always require identical regulatory rules."  *Illinois Transportation Trade Assoc. v. City of Chicago*, 839 F.3d 594, 598 (7th Cir. 2016).

Arcades and casinos are not "prima facie identical."  They are two different entertainment venues; that are subject to different regulatory schemes; and that attract very different clientele. Casinos are subject to extensive regulation by the Massachusetts Gaming Commission, including through rules implementing COVID-19 orders.  *See generally* Mass. Gen. Laws c. 23K and 271; *see also* 205 Code Mass. Regs. § 13.00; www.massgaming.com/new-events/covid19.  *See also* Order 43, ¶ 3 (providing that Massachusetts Gaming Commission, following consultation with

DPH, "shall issue and may from time to time amend COVID-19 safety rules for the operation of all casinos … operating under licenses issued pursuant to" enumerated statutory provisions and subject to the Gaming Commission's regulatory authority pursuant to Mass Gen. Law c. 219, §§ 135 and 137.  Gaming at casinos is limited to patrons 21 years of age or older, and casinos have their own security staff and security measures to enforce compliance with the rules.  Mass. Gen. Laws c. 23K, § 43.  In contrast, the number of arcades throughout Massachusetts is not limited by regulation and arcades themselves are not subject to the kind of extensive oversight exercised by the Gaming Commission.  Arcades can be burrowed in facilities and buildings that offer other services, such as restaurants and bars - like Bit Bar.  Thus, while there may be certain limited functional similarities between certain arcade games and certain casino games, the "extremely high degree of similarity" necessary to establish an equal protection violation is absent here.  *Progressive Credit Union*, 889 F.3d at 40.

Even if, however, arcades and casinos were deemed sufficiently "similarly situated" for purposes of Bit Bar's present challenge to Order 43, Bit Bar nonetheless would not prevail on its equal protection claim.  A plaintiff "not relying on typically impermissible bases for classification (e.g., race, religion, etc.) must show that it was 'intentionally treated differently from others similarly situated, that no rational basis exist[ed] for that difference in treatment, and the different treatment was based on a malicious or bad faith intent to injure.'"  *Rocket Learning, Inc. v. Rivera-Sanchez*, 715 F.3d 1, 10 (1st Cir. 2013), quoting *Buchanan v. Maine*, 469 F.3d 158, 178 (1st Cir. 2006).  "Unless a classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion, or alienage, our decisions presume the constitutionality of the statutory discriminations and require only that the classification challenged be rationally related to a legitimate state interest."  *City of New Orleans*,

427 U.S. at 303.  "[I]n the local economic sphere, it is only the invidious discrimination, the wholly arbitrary act, which cannot stand consistently with the Fourteenth Amendment." *Id*. at 303-304.  Here, Governor Baker implemented the COVID-19 Orders, specifically here Order 43, to prevent the spread of COVID-19 and protect the health and safety of individuals living in Massachusetts.

Under rational-basis review, a classification "comes to [the court] bearing a strong presumption of validity." *F.C.C. v. Beach Communications, Inc.*, 508 U.S. 307, 314 (1993).  Bit Bar attacking the classification's rationality has "the burden to negate every conceivable basis that might support it." *Id*. at 315.  *See also Starlight Sugar*, 253 F.3d at 145.  "'Even foolish and misdirected provisions' will be upheld under this test." *Kittery Motorcycle, Inc. v. Rowe*, 320 F.3d 43, 47 (1st Cir. 2003), quoting *Craigmiles v. Giles*, 312 F.3d 220, 223-24 (6th Cir. 2002). Moreover, "it is entirely irrelevant for constitutional purposes whether the [enacting authority] was actually motivated by the conceived reason for the challenged distinction." *Beach*, 508 U.S. at 315.  The choice of the enacting authority (here, of Governor Baker) "is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data.  Adherence to these restraints on judicial review preserves to the [executive] branch its rightful independence and its ability to function." *Beach*, 508 U.S. at 315; *see also South Bay*, 140 S. Ct. at 1613 (Roberts, C.J., concurring in the denial of application for injunctive relief) (when "officials undertake[] to act in areas fraught with medical and scientific uncertainties, their latitude must be especially broad" … and "should not be subject to second-guessing by an unelected federal judiciary, which lacks background, competence, and expertise to asses public health") (internal quotations and citations omitted).

In this case, Governor Baker could rationally determine to keep arcades temporarily closed while allowing casinos to reopen in Phase III, given the relatively higher number of arcades in Massachusetts and the fact that arcades are not subject to the kind of extensive regulatory framework that is provided by the Gaming Commission, which is expressly charged in Order 43 with issuing COVID-19 safety rules "for the operation of all casinos." *See South Bay*, 140 S. Ct. 1613, 2020 WL 2813056, at *1 (Roberts, C.J., concurring) ("Our Constitution principally entrusts '[t]he safety and the health of the people' to the politically accountable officials of the States 'to guard and protect.'") (quoting *Jacobson*, 197 U.S. at 38)).  Pursuant to Mass. Gen. Laws c. 23K, § 3(a), the Gaming Commission consists of five commissioners, with experience in, among other things, criminal investigations and law enforcement; legal and policy issues related to gaming; and gaming industry management.  Those distinctions alone supply rational justification sufficient to uphold the classification.  In addition, "equal protection does not demand that a State employ less burdensome alternatives if those are available." *Starlight Sugar*, 253 F.3d at 146.

In the wake of the current pandemic, numerous federal courts have upheld executive orders that distinguish between related types of business establishments or even mandate differential treatment within a single industry.  *See League of Indep. Fitness*, 2020 WL 3468281, at *2 (staying a lower court's injunction that would have permitted fitness centers to reopen); *In re Abbott*, 954 F.3d 772, 778 (5th Cir. 2020) (upholding executive order that required health care professionals to postpone nonessential surgeries and procedures in order to preserve critical medial resources for treatment of COVID-19 patients); *Best Supplement Guide, LLC v. Newsom*, 2020 WL 2615022, at *6 (E.D. Cal. May 22, 2020) (upholding executive order that required gyms to remain closed but allowed other businesses to reopen);

*Bayley's Campground Inc. v. Mills*, 2020 WL 2791797, at \*3 (D. Me. May 29, 2020) (upholding executive order despite plaintiffs' claim that it "discriminates-arbitrarily [ ]-in favor of business in rural counties"); *Talleywhacker Inc. v. Cooper*, 2020 WL 3051207, at \*11 (E.D.N.C. June 8, 2020) (upholding executive order that allowed restaurants to open but not adult entertainment). Courts in Massachusetts, too, have broadly affirmed the Governor's COVID-19 Orders. *See, e.g., CommCan*, 2020 WL 1903822 (denying request for preliminary injunction against order closing adult-use marijuana dispensaries while allowing liquor stores and adult medical marijuana treatment centers to remain open, because the Governor's COVID-19 Orders "are within the scope of the Governor's broad emergency powers").

Because the Governor's decision to temporarily close Bit Bar – a decision that has now been lifted – does not plausibly qualify as "arbitrary" or "unreasonable," *Jacobson*, 197 U.S. at 27-28, much less "beyond all question, a plain, palpable invasion of rights secured by the fundamental law," *id.* at 31, Bit Bar is not likely to succeed on the merits of its Equal Protection claim.

### 3.   Bit Bar cannot succeed on the merits of its due process claims.

Bit Bar is also unlikely to succeed on the merits of its due process claims.  Bit Bar had no fundamental right to conduct its business activities without interruption or limitation, particularly in the face of a pandemic threatening the health and safety of Massachusetts residents.  Bit Bar only had its ability to operate its business temporarily suspended.  There is no constitutionally protected property interest in future business profits.  *Coll. Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675 (1999) ("But business in the sense of the activity of doing business, or the activity of making a profit is not property in the ordinary

sense."); *Andrus v. Allard*, 444 U.S. 51, 66-67 (1979) ("[P]erhaps because of its very uncertainty, the interest in anticipated gains has traditionally been viewed as less compelling than other property-related interests"; "[r]egulations that bar trade in certain goods have been upheld against claims of unconstitutional taking.").

Even if Bit Bar had some minimally protected property interest in continuing its operations without interruption—which it does not—its procedural and substantive due process claims would nevertheless fail on the merits.  The Supreme Court considered and rejected a similar procedural due process claim over a century ago in a case involving circumstances comparable to the COVID-19 epidemic.  The case, *Compagnie Francaise de Navigation a Vapeur v. Board of Health of State of Louisiana*, arose out of a board of health's order quarantining a ship whose passengers had sailed from a country that was previously a source of yellow fever outbreaks in Louisiana.  186 U.S. 380, 381-83 (1902).  The company that owned the ship sued, contending, among other things, that the quarantine deprived it of "property without due process of law."  *Id.* at 387.  The Court rejected the claim, explaining that, if accepted, the theory would "strip the government, whether state or national, of all power to enact regulations protecting the health and safety of the people, or, what is equivalent thereto, necessarily amounts to saying that such laws when lawfully enacted cannot be enforced against person or property without violating the Constitution."  *Id.* at 393.  Even though the company had a property interest in its ship, no process was required before the board could lawfully quarantine the ship in service of public health.  *Id.*

The same result should apply here.  Even if Bit Bar has a property interest in its right to conduct business—which it does not—it is not entitled to notice or a hearing before the government may temporarily order closure of its business in order to prevent the spread of a

31

deadly virus. *Compagnie Francaise* makes clear that the Due Process Clause does not require government officials to take such time-consuming steps before acting on an emergency basis to stem a public health crisis. *See also Benner v. Wolf*, WL 2564920, at *4-5 (M.D. Pa. May 21, 2020) (providing "individualized pre-deprivation process" would overwhelm the government and decrease the effectiveness of the public health measures); *see also Savage v. Mills*, 2020 WL 4572314 (D. Me. Aug. 7, 2020) (addressing constitutionality of Governor's COVID-related Executive Orders and determining that "it ought to be apparent to Plaintiffs that police power is routinely exercised in this Country without first conducting public or private hearings, and without offending the Constitution.") quoting *Bayley's Campground*, 2020 WL 2791797 (2020).

Bit Bar's procedural due process claim fails as a matter of law for another reason. Because Order 43 was a prospective rule of general application, it was not subject to the notice and hearing requirements of the Due Process Clause. For purposes of procedural due process claims, the Supreme Court has long drawn a distinction between "proceedings for the purpose of promulgating policy-type rules or standards, on the one hand, and proceedings designed to adjudicate disputed facts in particular cases, on the other." *United States v. Fla. E. Coast Ry. Co.*, 410 U.S. 224, 245 (1973). Dating to its decision in *Bi-Metallic Investment Co. v. State Board of Equalization*, the Court has held that "[w]here a rule of conduct applies to more than a few people, it is impracticable that everyone should have a direct voice in its adoption." 239 U.S. 441, 445 (1915). In such contexts, individual due process rights—including notice and a right to be heard—do not attach. *See id.* at 445-46.

Here, Order 43 was a prospective policy-type rule of general application and was not, therefore, subject to the procedural requirements of the Due Process Clause. Acting pursuant to his authority under the Civil Defense Act of 1950, Governor Baker issued orders of general

applicability across the Commonwealth that required the temporary closure of all non-essential businesses and organizations during the height of COVID-19 infection.  COVID-19 Order No. 43, which applied across all economic sectors, adopted "policy-type rules or standards"; it was not "designed to adjudicate disputed facts in particular cases."  *Fla. E. Coast Ry.*, 410 U.S. at 245.  Moreover, it "affec[ted] a large number of people, as opposed to targeting a small number of individuals based on individual factual determinations."  *Gallo v. U.S. Dist. Ct. for the Dist. of Arizona*, 349 F.3d 1168, 1182-83 (9th Cir. 2003).  And it "appl[ied] prospectively, and d[id] not seek to impose any retroactive penalty."  *Interport Pilots Agency Inc. v. Sammis*, 14 F.3d 133, 142 (2d Cir. 1994).  Bit Bar's procedural due process claim fails on this second basis as well.

As for Bit Bar's substantive due process claim, it is also unlikely to succeed.  In *Savage*, 2020 WL 4572314, plaintiffs contended that the Governor of Maine deprived them of a liberty and property because the Executive Orders allegedly caused the "shuttering [of] their businesses."  The district court determined that plaintiffs' "businesses are presently allowed to operate, and, even if they were not, that alone would not constitute deprivation entitled to Due Process protections."  Citing *Coll. Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675 (1999) (concluding that "business in the sense of the activity of doing business, or the activity of making a profit is not property in the ordinary sense.").

Also, the Governor's actions to protect the public health of the Commonwealth can hardly be said to "shock the conscience."  The substantive due process inquiry involves "a comprehensive analysis of the attendant circumstances before any abuse of official power is condemned as conscience-shocking."  *DePoutot v. Raffaelly*, 424 F. 3d 112, 119 (1st Cir. 2005).  In Massachusetts alone, more than 136,000 people have been infected and almost 9,300 people have died.  Although Bit Bar's business may have been affected by the Governor's COVID-19

Orders, specifically Order 43, the burden on Bit Bar's business in order to protect public health in light of this deadly virus can hardly be said to "shock the conscience."

    **D.**  <u>**The Balance of Hardships and the Public Interest Strongly Favor Upholding the Governor's Order 43**</u>.

As discussed, Bit Bar's failure to establish that it will likely prevail on its injunctive claims alone warrants denial of its motion for preliminary injunction.  *See, e.g.*, *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002) ("[I]f the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining [preliminary injunction] factors become matters of idle curiosity.").   To the extent this Court considers the other factors, they weigh decisively against the interlocutory relief requested by Bit Bar.

While Bit Bar has undoubtedly experienced economic hardship, the unfortunate reality is that many businesses and individuals have suffered economic hardship as a result of the pandemic and the government's necessary response to it.  Bit Bar's suggestion of irreparable harm is undermined by its decision to wait more than six months, following the temporary closure of arcades and other "non-essential" businesses, to file its complaint.  *See Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 163 (1st Cir. 2004) (plaintiffs' cries of urgency are sharply undercut by rather leisurely approach to preliminary injunctive relief); *SMA Life Assurance Co. v. Sanchez-Pica*, 960 F.2d 274, 277-78 (1st Cir. 1992) (affirming denial of motion for injunction where court relied upon plaintiff's six-month delay in seeking relief); *Fritz v. Arthur D. Little, Inc.*, 944 F. Supp. 95, 98 (D. Mass. 1996) ("Unwarranted delay in seeking a preliminary injunction ... undercuts the movant's claim of irreparable injury.").

The challenged portion of Order 43 no longer is in effect, there is nothing left for the Court to enjoin.  Were the Court to issue an injunction here, it would not change Bit Bar's rights

34

or status in any respect, since it has been allowed to reopen by virtue of Order 50 since September 17.  The only effect of such an injunction would be as an advisory opinion, to be used by others seeking to challenge or limit other orders by the Governor aimed at responding to the present public-health emergency.  This would be directly contrary to the Supreme Court's repeated admonition that elected officials, not unelected judges, should have primary responsibility for addressing a crisis of this kind.  *South Bay*, 140 S. Ct. at 1613-14.  The public interest would be dramatically and negatively impacted by a such a result.

## CONCLUSION

For the reasons set forth above, Governor Baker respectfully requests that this Court deny Bit Bar's motion for a preliminary injunction and dismiss the Complaint, with prejudice.

Respectfully submitted,

GOVERNOR CHARLES D. BAKER, in his official capacity,

By his attorneys,

MAURA HEALEY
ATTORNEY GENERAL

/s/ LaRonica K. Lightfoot
LaRonica K. Lightfoot (BBO No. 569350)
Assistant Attorney General
One Ashburton Place
Boston, MA 02108
(617) 963-2357
October 13, 2020                LaRonica.Lightfoot@mass.gov

## CERTIFICATE OF SERVICE

I certify that this document, filed through the Court's CM/ECF system on October 13, 2020, will be sent electronically to plaintiff's counsel through the ECF system.

/s/ LaRonica K. Lightfoot
LaRonica K. Lightfoot

35