**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| BOSTON BIT LABS, INC., d/b/a BIT BAR SALEM, a Massachusetts corporation,<br><br>                Plaintiff,<br>    v.<br>CHARLES D. BAKER, in his official capacity as Governor of the Commonwealth of Massachusetts,<br><br>                Defendant. | Civil Action No. 1:20-cv-11641<br><br>**OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE COMPLAINT** |

Plaintiff Boston Bit Labs, Inc., d/b/a Bit Bar Salem ("Bit Bar") hereby files its Opposition to Defendant Charles D. Baker's Motion to Dismiss the Complaint (Doc. Nos. 15 & 17).

## 1.0 INTRODUCTION AND FACTUAL BACKGROUND

Bit Bar operates restaurant-arcade, which allows customers to play video games using machine kiosks while purchasing and consuming food and drink. (Doc. No. 1 at ¶¶ 24-26.) Starting in March 2020, Defendant declared a state of emergency in the Commonwealth of Massachusetts due to the outbreak of the 2019 novel Coronavirus ("COVID" or "COVID-19"). (*Id*. at ¶ 11.) From March to July 2020, Defendant issued a series of executive orders ("COVID-19 Orders") allowing some businesses to reopen with restrictions, while keeping others closed. (*Id*. at ¶¶ 12-21.) Video game arcades were originally slated to be Phase III businesses (along with casinos, museums, fitness centers, and performance halls), which would be reopened in July 2020, while Phase IV businesses (such as ball-pits, hot tubs, steam rooms, and dance clubs) would remain closed. (*Id*. at ¶¶ 19-22.) Without warning, explanation, or due process, however, Defendant's July 2, 2020 COVID-19 Order ("Covid-19 Order No. 43") recategorized video games arcades as Phase IV businesses, forcing them to remain closed, while recategorizing theaters, concert halls, ballrooms, laser tag arenas, and private-party rooms as Phase III businesses. (*Id*. at ¶ 22.)

Shortly after Bit Bar filed suit, Defendant issued COVID-19 Order No. 50, which again recategorized which businesses fit the Phase III designation and placed video game arcades back into this category. Defendant claims that this late unilateral change to his executive orders, made in response to this suit, moots Bit Bar's claims. Bit Bar's contemporaneously-filed reply in support of its Motion for a Preliminary Injunction explains how this is not the case; in short, with a potential surge in COVID-19 cases and under the voluntary cessation doctrine, where Gov. Baker could resume the discriminatory treatment at a whim, the matter cannot be deemed moot. Defendant also asserts Bit Bar's claims, if not moot, should be dismissed under Fed. R. Civ. P. 12(b)(6) under the premise that Bit Bar's provision of video games is not speech under the First Amendment. This assertion is wrong, and Defendant's COVID-19 Order No. 43 cannot satisfy rational basis review, let alone strict scrutiny. Defendant provides no more than hypothetical justifications for his Order that are well outside the four corners of the Complaint, and in any event are unsupported by any evidence. The Court should deny Defendant's Motion to Dismiss and allow Bit Bar's claims to proceed.

**2.0   LEGAL STANDARD**

Under Fed. R. Civ. P. 12(b)(6), a complaint only needs to allege facts sufficient to "state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A court must "accept[] as true all well-pleaded facts, analyz[e] those facts in the light most hospitable to the plaintiff's theory, and draw[] all reasonable inferences for the plaintiff." *United States ex rel. Hutcheson v. Blackstone Med., Inc.*, 647 F.3d 377, 383 (1st Cir. 2011). In bringing a motion to dismiss for failure to state a claim, a defendant may not rely on evidence or information outside the four corners of the complaint without converting the motion to dismiss into a motion for summary judgment. Fed. R. Civ. P. 12(d); *see Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 615 (D. Mass. 2016) (finding that "the "Court is limited at this stage to evaluating the four corners of the complaint and certain undisputed or critical documents, not statements made at oral argument"); *see also young v. Lepone*, 305 F.3d 1, 10-11 (1st Cir. 2002) (noting that "[t]he fact of a motion to dismiss under Rule 12(b)(6) ordinarily depends on the allegations contained within the four corners of the plaintiff's complaint").

Bit Bar's Complaint adequately alleges its claims for relief under the 1st and 14th Amendments. In his Opposition, Defendant alludes to (without actually attaching) information and evidence not located within the Complaint as justifications for his unconstitutional policies. But he does not request that his motion be converted to a motion for summary judgment (and none of the new information or evidence he tries to add would be otherwise admissible), and thus the Court should disregard it.

## 3.0 ARGUMENT

### 3.1 COVID-19 Order No. 43 Violated Bit Bar's First Amendment Rights

In any First Amendment claim based on a government restriction of speech, the first question is what level of scrutiny the government must satisfy. Gov. Baker's COVID-19 Orders are based on the content of speech and cannot survive strict scrutiny. But, even if they were not content-based restrictions, Gov. Baker's Orders cannot withstand any degree of scrutiny.

#### 3.1.1 COVID-19 Order No. 43 is Subject to Strict Scrutiny

COVID-19 Order No. 43 treats video-game arcades and casinos differently based upon the images and text displayed by computer screens affixed to large boxes. A regulation is content-based if it "applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015) (finding that regulation which specified "political signs" and "ideological signs" was content-based). In deciding whether a restriction is content-based, a court must "consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys." *Id*. Some such restrictions are obvious, while "others are more subtle, defining regulated speech by its function or purpose." *Id*. Even facially content-neutral regulations will be considered content-based if they cannot be "justified without reference to the content of the regulated speech." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). To survive strict scrutiny analysis, a restriction on speech must "prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*, 131 S. Ct. 2806, 2817 (2011).

Video games are expressive content protected under the First Amendment. "Like the protected books, plays, and movies that preceded them, video games communicate ideas — and even social

messages — through many familiar literary devices (such as characters, dialogue, plot, and music) and through features distinctive to the medium (such as the player's interaction with the virtual world). That suffices to confer First Amendment protection." *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 790 (2011) ("*EMA*").

> Crudely violent video games, tawdry TV shows, and cheap novels and magazines are no less forms of speech than The Divine Comedy, and restrictions upon them must survive strict scrutiny--a question to which we devote our attention in Part III, infra. Even if we can see in them "nothing of any possible value to society . . . , they are as much entitled to the protection of free speech as the best of literature."

*Id*. at 796 n.4. It is "self evident" that "video games are protected as expressive speech under the First Amendment." *Hart v. Elec. Arts, Inc.*, 717 F.3d 141, 148 (3d Cir. 2013). Defendant willfully ignores this dispositive line of cases in his motion.

*EMA* dealt with a California law that forbade the sale of violent video games to minors, *i.e.*, the provision of First Amendment-protected material to the consuming public. Because that law was based on the content of video games, it was subject to strict scrutiny. *EMA*, 564 U.S. at 799. Similarly, Gov. Baker's COVID-19 orders are content-based. They allow some businesses that offer some kinds of electronic games to stay open, while forcing business that offer different kinds of games to remain closed. Specifically, the orders allow casinos in Massachusetts, which offer electronic gambling games using machine kiosks, to stay open while forcing video game arcades, which offer electronic non-gambling games using machine kiosks, to remain closed. There is no meaningful distinction between the permitted and forbidden games other than their content. Gov. Baker is allowing games of chance, while not allowing games made purely for entertainment. The government's regulations are thus based on the content of speech and must be struck down unless they can survive strict scrutiny. They cannot.

Defendant argues strict scrutiny does not apply here because Bit Bar merely provides video games to customers and did not make the games itself. This is an argument without support in First Amendment jurisprudence. The provision of creative works to customers is conduct protected under

the First Amendment. The plaintiff in *Winters v. New York*, 333 U.S. 507 (1948) was a bookseller arrested for possession with to sell magazines that violated a criminal statute forbidding the sale of violent literature. Though styling this conduct in terms of the freedom of the press, the Court acknowledged that bookseller's constitutional rights "cover[] distribution as well as publication." *Id*. at 509. The Supreme Court has found generally that one's rights under the First Amendment encompass the right to distribute creative works. *See Martin v. City of Struthers*, 319 U.S. 141, 143 (1943) (holding that the "freedom [of speech and press] embraces the right to distribute literature, and necessarily protects the right to receive it"); *see also Lovell v. City of Griffin*, 303 U.S. 444, 452 (1937) (holding that liberty "'of circulating is as essential to . . . freedom [of speech and press] as liberty of publishing; indeed, without the circulation, the publication would be of little value'").

A restriction on the ability of video game arcades to operate is comparable to restrictions on bookstores or movie theaters. There is a large body of First Amendment case law regarding such establishments (typically adult ones), and the analysis has never turned on whether the bookstore or theater was the original creator of the works being suppressed. *See, e.g., City of Colorado Springs v. 2354 Inc.*, 896 P.2d 272, 292-93 (1995) (suit brought by companies and individuals operating adult bookstores); *Smith v. Cal.*, 361 U.S. 147, 150 (1959) (in suit by bookstore proprietor, stating that "it also requires no elaboration that the free publication and dissemination of books and other forms of the printed word furnish very familiar applications of these constitutionally protected freedoms. It is of course no matter that the dissemination takes place under commercial auspices. Certainly a retail bookseller plays a most significant role in the process of the distribution of books"). One has a First Amendment right to disseminate the ideas of others, and the existence of a profit motive has no bearing on this. Defendant's novel theory, which relies on no precedent, undermines its entire argument.

Defendant attempts to analogize the facts here to *World Gym, Inc. v. Baker*, 2020 U.S. Dist. LEXIS 131236 (D. Mass. July 24, 2020), but that case is easily distinguishable. There was no First Amendment right at issue because the plaintiff was providing exercise machines, not video games, films, or books, to its customers. Without any expressive works, the First Amendment had no application. The same goes for *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 685 (9th

Cir. 2019), where the plaintiff provided booking transactions for unlawful rentals. This is categorically different from Bit Bar providing its customers the use of machines to access and enjoy First Amendment-protected creative works. The remainder of Defendant's cases cited in support of this proposition fail for the same reasons; any speech in such cases was incidental to conduct actually being prohibited, whereas here the central feature of Defendant's discriminatory conduct was in making it unlawful for Bit Bar to allow customers to play its games.

### 3.1.2 COVID-19 Order No. 43 Does Not Survive Strict Scrutiny

To survive strict scrutiny, the government must show its COVID-19 orders (1) further a compelling government interest and (2) the orders are narrowly tailored to achieve that interest. *Bennett*, 131 S. Ct. at 2817. Poor and haphazard decisions in the early days of the pandemic were understandable. With competing information and on-the-fly decision-making, anyone could be forgiven for making illogical decisions in February or March of 2020. But, it is now October, and cooler heads must prevail. So far, the only thing cool about the process is the cold silence from Beacon Hill when Bit Bar and his array of legislators have asked the government to behave with reason and respect for the Constitution.

Defendant's purported interest in promulgating his COVID-19 Orders, protecting the public during a global pandemic, is *potentially* compelling enough to justify suspending the First Amendment – but not if cooler heads actually do prevail. The Orders do not further this interest. Casinos with gambling machines are permitted to operate, while gaming arcades using functionally identical machines in a nearly identical manner cannot. If Casinos can operate safely, then so can gaming arcades. If arcades can be open, as long as the machines are unplugged, but they become unsafe as soon as the video content begins to flow, then there is really no rhyme or reason for the regulations. Categorizing video game arcades as Phase IV enterprises does not further Defendant's interest – nor anyone else's. This is especially so for restaurant-arcades, where customers are allowed in the premises where video game machines are located (because the restaurant portion of the business is a Phase III enterprise), but simply cannot use them. They can stand next to them. They can rest cocktails on them. They can even *pretend* to play them. They can preen in their reflection in the dormant

screens. But, plug in the machines and let the First Amendment protected content start flowing through the nearly-antique cathode ray tubes, and all of a sudden, a Galaga machine becomes something as dangerous and sinister as the now-discredited moral panickers of the 1980s thought it was.

Defendant points to this bizarre state of partial opening as evidence that the burden on Bit Bar's speech caused by COVID-19 Order No. 43 is merely incidental to its First Amendment-protected activity. (Doc. No. 17 at 24.) The exact opposite is true; the Order exclusively and specifically prohibits the provision of video games protected by the First Amendment, making the Order a targeted restriction on speech, rather than an incidental one.

This gaping hole in Defendant's purported rationale undermines the importance of the asserted government interest. "[A] law cannot be regarded as protecting an interest of the highest order . . . when it leaves appreciable damage to that supposedly vital interest unprohibited." *Town of Gilbert*, 135 S. Ct. 2218, 2232 (2015) (internal quotation marks omitted). Either both casinos and video game arcades are unsafe or they are both safe. There is no factual basis for asserting one is safe while the other is not.

Where Defendant's Orders more particularly fail is in their lack of narrow tailoring. Their burden on speech "is unacceptable if less restrictive alternatives would be at least as effective achieving [their] legitimate purpose." *Reno v. ACLU*, 521 U.S. 844, 849 (1997). In Defendant's judgment, gaming arcades must remain closed to prevent the spread of COVID-19 because the CDC advises that the virus:

> is spread mainly by person-to-person contact and that the best means of slowing the spread of the virus is through practicing social distancing and protecting oneself and others by minimizing in-person contact with others and with environments where this potentially deadly virus may be transmitted including, in particular, spaces that present enhanced risks because of limited ventilation or large numbers of persons present or passing through who may spread the virus through respiratory activity or surface contacts.

(Doc. No. 3-12 at 1.) The problem with this reasoning is that it applies with equal (if not greater) force to casinos with gaming machines, which are allowed to operate. Casino floors have just as many, if

- 7 -
Opposition to Motion to Dismiss

not more, people in close proximity to one another as you would find in a restaurant-arcade like Bit Bar, particularly where their electronic gambling machine kiosks are in such close proximity. Both types of business have the same sort of indoor ventilation. Both types of business have machine kiosks customers use where they will be touching the same surfaces as other customers. Both businesses' machines can be wiped down between users.

If Defendant's rationale for treating arcades as Phase IV enterprises is accepted, his COVID-19 Orders are grossly underinclusive because they allow businesses that pose the same (or greater) health risks to consumers to stay open. Gov. Baker's preference for gambling machines in casinos has no relationship to the stated purpose of his COVID-19 orders, making them underinclusive, and thereby "rais[ing] serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *EMA*, 564 U.S. at 802. The more likely explanation is that Gov. Baker is expressing favoritism for Casinos in Massachusetts and is making decisions completely unrelated to public safety. Other state legislators and experts have also expressed bafflement at the purported justification for treating casinos more permissively than video game arcades. (*See* Doc. No. 1 at ¶¶ 11-12; Doc. Nos. 13-13, 13-15, & 13-16.)

This is far from the narrow tailoring necessary to justify a content-based restriction on speech. Bit Bar thus has a strong likelihood of success on the merits of its First Amendment claim. Defendant does not attempt to justify COVID-19 Order No. 43 in the face of strict scrutiny, instead arguing that a lesser degree of scrutiny applies. It is still worth addressing his purported justifications here, though.

Defendant asserts that "[g]aming at casinos is limited to patrons 21 years of age or older, and casinos have their own security staff and security measures to enforce compliance with the rules," citing Mass. Gen. Laws c. 23K, § 43. This statutory provision, however, only provides that individuals under 21 years of age cannot gamble at a gaming establishment. There is no support for Defendant's claims regarding security staff and security measures. Even if there were, there is nothing to suggest casinos are inherently safer by not allowing individuals under 21 years of age to gamble; if anything, adults of drinking age would be less responsible than minors or young adults who cannot consume liquor. There is also nothing to suggest video game arcades are incapable of devising or utilizing their

own security measures to accommodate for social distancing and hygiene requirements. Indeed, COVID-19 Order No. 50 requires them to do so. Defendant also makes an unsupported reference to "extensive oversight" of casinos by the Massachusetts Gaming Commission, but there is no explanation of how the Gaming Commission is more qualified than the Department of Health to enforce business regulations. A different regulatory body does not make casinos any safer from COVID. None of these alleged facts, most of which cannot be considered on a Rule 12(b)(6) motion, allow COVID-19 Order No. 43 to survive strict scrutiny.

### 3.1.3  COVID-19 Order No. 43 Cannot Survive Intermediate Scrutiny

Defendant argues intermediate scrutiny applies here because the only speech at issue here is commercial in nature. This is an odd assertion, as the only thing commercial about playing a video game is putting quarters in a machine. It is no more commercial speech than the Boston Globe, which requires newsstand or subscription purchase to access its contents. *Compare N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 266, 84 S. Ct. 710, 718 (1964)("The publication here was not a 'commercial' advertisement …. That the Times was paid for publishing the advertisement is as immaterial in this connection as is the fact that newspapers and books are sold.") The "core notion" of commercial speech is "speech that does no more than propose a commercial transaction." *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66, 103 S. Ct. 2875, 77 L. Ed. 2d 469 (1983) (quoting *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 762, 96 S. Ct. 1817, 48 L. Ed. 2d 346 (1976)). Bit Bar's conduct of permitting customers to play video games plainly does not fall into this core notion; the speech consists of the video games, not an advertising flyer. Speech may be commercial despite not falling within this "core notion" of commercial speech, but it must satisfy the 3-part test laid out in *Bolger*. The Supreme Court, in reviewing informational pamphlets regarding public health issues, determined that (1) the pamphlets were concededly advertisements, (2) they referred to specific products sold by the defendant, and (3) the defendant had an economic motivation for the speech. 430 U.S. at 66 & n.13, 67. The combination of all of these characteristics led to the conclusion that the pamphlets were commercial speech.

Here, however, Bit Bar does not concede that the video games it offers to customers are advertisements. That concession would be false and nonsensical. The video games do not refer to any products or services sold by Bit Bar, aside from the games themselves.[2] And while there is an economic motivation for selling any creative work, this alone is not sufficient to make speech commercial. *See, e.g., Tobinick v. Novella*, 848 F.3d 935, 952 (11th Cir. 2017) (noting that "magazines and newspapers often have commercial purposes, but those purposes do not convert the individual articles within these editorial sources into commercial speech . . . Even if Dr. Novella receives some profit for his quasi-journalistic endeavors as a science skeptic, the articles themselves, which never propose a commercial transaction, are not commercial speech simply because extraneous advertisements and links for memberships may generate revenue"). None of the speech burdened by COVID-19 Order No. 43 is commercial, and so strict scrutiny applies.

Assuming, *arguendo*, that the speech at issue is commercial in nature or Defendant's Orders are not content-based, they still burden Bit Bar's First Amendment rights and do not survive intermediate scrutiny. *See Martin v. Gross*, 340 F. Supp. 3d 87, 92-93 (D. Mass. 2018) (applying intermediate scrutiny to statute that criminalized willful interception of communications, to extent it prohibited secret recordings of public officials performing their duties); *Rideout v. Gardner*, 838 F.3d 65, 67-68 (1st Cir. 2016) (applying intermediate scrutiny to statute forbidding citizens from photographing marked ballots and publicizing said photographs).

Content-neutral regulations "do not apply to speech based on or because of the content of what has been said, but instead 'serve[] purposes unrelated to the content of expression.'" *Rideout*, 838 F.3d at 71 (quoting *Ward*, 491 U.S. at 791). Such restrictions must be "narrowly tailored to serve a significant governmental interest." *Ward*, 491 U.S. at 791. The "narrow tailoring" for intermediate scrutiny does not require the regulation to "'be the least restrictive or least intrusive means of' serving the government's interests." *McCullen v. Coakley*, 134 S. Ct. 2518, 2535 (2014) (quoting *Ward*, 491 U.S. at 798). However, "the government still 'may not regulate expression in such a manner that a

---

[2] This does not suggest Bit Bar's speech is commercial. Otherwise, all cinema would be commercial speech because the movie displays its own title.

substantial portion of the burden on speech does not serve to advance its goals.'" *Coakley*, 134 S. Ct. at 2535 (quoting *Ward*, 491 U.S. at 799). If there is a "substantial mismatch between the Government's stated objective and the means selected to achieve it," the regulation is unconstitutional. *McCutcheon v. Fed. Election Comm'n*, 134 S. Ct. 1434, 1446 (2014).

Defendant claims to have imposed his COVID-19 Orders for the purpose ensuring public health and safety. In the abstract, this is a significant government interest, "[b]ut intermediate scrutiny is not satisfied by the assertion of abstract interests. Broad prophylactic prohibitions that fail to 'respond[] precisely to the substantive problem which legitimately concerns' the State cannot withstand intermediate scrutiny." *Rideout*, 838 F.3d at 72 (quoting *Members of City Council of L.A. v. Taxpayers for Vincent*, 466 US. 789, 810 (1984)). Defendant alludes to scientific data and consultation with health experts, but (1) this alleged data is not part of the complaint and is not in the record, and thus may not be considered on a motion to dismiss; and (2) Defendant has provided no such data specifically justifying why it would be safer for casinos to turn on their slot machines than for Bit Bar to turn on its video games. It is extraordinarily unlikely that any such unspecified information or experts support the position that one is safer than the other. Because there is no meaningful health-related distinction to be drawn between casinos and video arcades, Defendant's asserted interest is merely an abstract one that is not furthered in any way by his COVID-19 Orders.

For the same reason, COVID-19 Order no. 43 is not narrowly tailored to achieve Defendant's purported ends. There is a "substantial mismatch" in the government's purported goal caused by closing arcades but allowing casinos to operate. Allowing congregation at an arcade game, but not allowing it to be turned on, would not reasonably be expected to alter transmission potential. Accordingly, the majority of the burden on speech does not advance the state's goals, causing COVID-19 Order No. 43 to fail intermediate scrutiny.

Defendant provides no specific argument to justify COVID-19 Order No. 43. Instead he merely refers to "the pandemic's far-reaching impact," the closure of other businesses and facilities, and the unspecified "recommendations of public health officials." (Doc. No. 17 at 25.) These are not facts alleged within the Complaint, and Defendant provides no evidentiary support for his contentions

(including evidence submitted, but otherwise impermissible to be considered). He also completely ignores the real issue: allowing casinos to operate in full while video game arcades were forced to turn off their similarly-situated game machines.

### 3.1.4 COVID-19 Order No. 43 Cannot Survive Even Rational Basis Review

Defendant's COVID-19 Order No. 43 is arbitrary and cannot survive even rational basis review. Rational basis review is satisfied if the government's "legislative means are rationally related to a legitimate government purpose." *Hodel v. Indiana*, 452 U.S. 314, 331 (1981).

Defendant does not address rational basis review in the context of Bit Bar's First Amendment claim, instead saving that discussion for its equal protection claim. Though this standard of review is extremely deferential to the government, COVID-19 Order No. 43 fails even this test for the same reasons it fails to survive strict and intermediate scrutiny. There are no facts that would support the assertion that a casino with electronic gambling machine kiosks turned on is a safer environment than a restaurant-arcade that uses similar video game machine kiosks turned on in a similar layout. There is no factual basis for believing that casinos are safer than video game arcades. There is no rational basis to allow the presence of dormant video games, with a health hazard only appearing if they are turned on. To highlight the absurdity of Gov. Baker's orders, Bit Bar has video game machines as dining tables, but it cannot allow them to be turned on while people are eating on them. (Doc. No. 3-2 at ¶ 9.) As explained in Section 3.1.2, *supra*, Defendant's purported justifications make no sense. He provides a number of unsupported allegations about the management of casinos, but these explanations are unrelated to the issue of whether casinos, in the middle of a pandemic, are safer than video game arcades. COVID-19 Order No. 43 fails even rational basis review.

It is not until discussing rational basis review that Defendant attempts to explain himself. This is a telling admission that there is no real factual basis for COVID-19 Order No. 43, and that the best he can do is have his counsel idly speculate as to hypothetical rationales, none of which are mentioned in the Complaint or are supported by any evidence. That there are a purported "relatively high number of arcades" and that they are purportedly "not subject to the kind of extensive regulatory framework" of the Gaming Commission does not support discriminatory treatment. First, even assuming arcades

are "relatively high" in number, there is no explanation as to how allowing them to be open as restaurants, but not permitting them to turn on the gaming devices, relates to COVID-19 safety. And, the regulatory framework of the Gaming Commission is no more extensive as to viral transmission than the state and local departments of health.

Furthermore, Defendant asserts that, at the motion to dismiss stage in evaluating government action under rational basis review, the Court must accept any purported justification for government action, regardless of a complaint's allegations or the attenuated nature of the justification. But this is not so. For example, the District of Puerto Rico in *Pena-Martinez v. Azar* evaluated under rational basis review the government's purported justification for denying Puerto Ricans certain benefits. 376 F. Supp. 3d 191 (D.P.R. 2019). It noted that extrinsic evidence the government tried to introduce in a motion to dismiss "cannot defeat a well-pleaded complaint at the motion to dismiss stage." *Id*. at 214-15. The Court also reviewed the evidence the government relied on for its actions and determined that it did not actually support the government's purported justification. *Id*. at 215 (finding that report indicating administering government benefits for Puerto Rico residents would be expensive did not support government's argument that administration would "disrupt" Puerto Rico's economy). Even under rational basis review at the motion to dismiss stage, the Court is permitted to determine whether the government's argument makes sense. Defendant's argument does not.

### 3.1.5 COVID-19 Order No. 43 is Not Subject to Deferential Review Under *Jacobson v. Massachusetts*

Defendant insists a different level of lax scrutiny, unique to epidemics, should apply here, relying on *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), which dealt with a mandatory vaccination law. Under this standard, which pre-dates modern 14th Amendment jurisprudence, a court may not inquire into the government's reasoning in passing a law "'enacted to protect the public health, the public morals or the public safety" unless it "has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law . . . .'" *Id*. at 31 (quoting *Mugler v. Kansas*, 123 U.S. 623, 661 (1887). But *Jacobson* was decided well before the strict scrutiny test was even developed, much less applied in the context of First Amendment

- 13 -
Opposition to Motion to Dismiss

challenges. This much is obvious from the formulation of the "test" itself in *Jacobson*. A statute is not subject to a hyper-deferential standard of review simply because it purports to be passed for the sake of public morality. *See Winters v. New York*, 333 U.S. 507, 514, 519 (1948) (rejecting argument that statute prohibiting distribution of "stories of bloodshed and lust" because such works were "likely to bring about the corruption of public morals or other analogous injury to the public order," and finding such statute unconstitutional); *see also 44 Liquormart v. R.I.*, 517 U.S. 484, 514 (1996) (rejecting a "vice" exception to the First Amendment, as "[a]lmost any product that poses some threat to public health or public morals might reasonably be characterized by a state legislature as relating to 'vice activity'").

There is no suggestion in the case law Defendant cites that the test in *Jacobson* preemptively overruled later constitutional jurisprudence. *Jacobson* does not grant the Commonwealth license to "contravene the Constitution of the United States, nor infringe any right granted or secured by that instrument." 197 U.S. at 25. While the Supreme Court in *S. Bay United Pentecostal Church v. Newsom* cited *Jacobson* with approval in denying a request for injunctive relief from a church, it only came to this conclusion after noting that "[s]imilar or more severe restrictions apply to comparable secular gatherings . . . where large groups of people gather in close proximity for extended periods of time." 140 S. Ct. 1613, 1613 (2020). There was no functional discrimination. This is entirely different from the facts here, where Defendant has allowed businesses that offers gambling machine kiosks to customers to open, while forcing businesses that offer video game machine kiosks to customers to close. In the context of COVID-19, other federal courts have found that the state's police powers during a pandemic are not unlimited and that the courts may reign in government overreach. *Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610 (6th Cir. 2020), for example, dealt with a COVID-19 order forbidding churches from holding drive-in or in-person services, regardless of whether social distancing guidelines were being observed. The order was riddled with exceptions, however, for secular "life-sustaining" businesses that included "law firms, laundromats, liquor stores, and gun shops." *Id*. at 614. The court found that:

> restrictions inexplicably applied to one group and exempted from another do little to further the[ goals of public health and safety] and do much to burden religious freedom. Assuming all of the same precautions are taken, why is it safe to wait in a car for a liquor store to open but dangerous to wait in a car to hear morning prayers? Why can someone safely walk down a grocery store aisle but not a pew? And why can someone safely interact with a brave deliverywoman but not with a stoic minister? The Commonwealth has no good answers. While the law may take periodic naps during a pandemic, we will not let it sleep through one.

*Id*. at 615.

Trying to prevent the spread of a pandemic is a noble and important goal. But these noble intentions do not excuse Defendant from compliance with the Constitution. Even if the *Jacobson* standard were to apply, Defendant's orders would still fail this test. In the abstract, there is indeed a "real and substantial relation" between shutting down businesses and protecting public health.[3] There is no such relation, however, between allowing casinos to fully operate while keeping video game arcades from turning on their gaming machines. Just as COVID-19 Order No. 43 cannot satisfy even rational basis review, it cannot satisfy the *Jacobson* test.

### 3.2 COVID-19 Order No. 43 Violated Bit Bar's Fourteenth Amendment Rights

#### 3.2.1 COVID-19 Order No. 43 Violates Equal Protection

COVID-19 Order No. 43 violates equal protection. The Equal Protection Clause contained in the U.S. Constitution provides that no state shall deny to any person within its jurisdiction equal protection of the laws. *See* U.S. Const. *amend. XIV, § 1*. To bring a successful equal protection claim, a plaintiff must show differential treatment from a similarly situated class. *Washington v. Davis*, 426 U.S. 229, 239 (1976). The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. 439 (1985) (citation omitted) (superseded by statute on unrelated grounds as stated in *Human Res. Research & Mgmt. Group v. County of Suffolk*, 687 F. Supp. 2d 237, 255-56 (E.D.N.Y. 2010)). The

---

[3] In support of this "real and substantial relation" argument, Defendant cites an unauthenticated "Massachusetts Department of Public Health COVID-19 Dashboard" without attaching the document itself. (*See* Doc. No. 17 at 6, fn.4.) This document is not referenced in or related to the Complaint (and, in fact, post-dates the Complaint by more than a month), and thus may not be considered in deciding Defendant's motion to dismiss.

test applied depends on the type of classification and the conduct being regulated. If a regulation burdens "fundamental rights" such as free speech or employs "suspect" classifications such as race, the regulation is subject to strict scrutiny. *Kittery Motorcycle, Inc. v. Rowe*, 320 F.3d 42, 47 (1st Cir. 2003). If fundamental rights or suspect classifications are not implicated, then the regulation need only satisfy rational basis review. *Hodel v. Ind.*, 452 U.S. 314, 331-32 (1981).

The Supreme Court has at times fused together the analysis under the First and Fourteenth Amendments when dealing with content-based restrictions on speech. *See R.A.V. v. St. Paul*, 505 U.S. 377, 384 n.4 (1992) (stating "[t]his Court . . . has occasionally fused the First Amendment into the Equal Protection Clause"); *Burson v. Freeman*, 504 U.S. 191, 197 n.3 (1992) (stating "[u]nder either a free-speech or equal-protection theory, a content-based regulation of political speech in a public forum is valid only if it can survive strict scrutiny"); *Erznoznik v. Jacksonville*, 422 U.S. 205, 215 (1975) (holding that under either the First Amendment or the Equal Protection Clause, there must be "clear reasons" for content-based restrictions).

The First Amendment and Equal Protection analyses are similar here. As explained in Section 3.1.1, *supra*, COVID-19 Order No. 43 burdens Bit Bar's fundamental First Amendment right to display and allow customers to play video games. The Order clearly gives preferential treatment to casinos over video game arcades, despite there being no real or imagined public health or safety related reason for doing so. Gov. Baker thus burdened Bit Bar's First Amendment rights without furthering a compelling government interest in a narrowly tailored fashion, thus violating Bit Bar's right to equal protection under the Fourteenth Amendment. The fact that the majority of the burden imposed on free speech does not advance Defendant's purported goals (sitting at an arcade game that is off is no safer than sitting at one that is on) shows that the Order does not satisfy intermediate scrutiny. Defendant's inexplicable preference for casinos does not even pass muster under rational basis review, as there is no conceivable connection between this preference and a legitimate government interest.

Defendant does not attempt to justify its unconstitutional discrimination under strict or intermediate scrutiny, instead claiming rational basis review applies because his Order does not burden a fundamental right. The Order does, however, burden Bit Bar's fundamental First Amendment rights,

making Defendant's legal analysis faulty. But, even if Defendant were correct, Bit Bar and other video game arcades or restaurant-arcades are substantially similar to casinos offering video gambling machines. Defendant attempts to distinguish them by reference to age restrictions and oversight by the Gaming Commission, but these alleged distinctions are unrelated to the question of whether there are any safety concerns posed by one business and not the other. Bit Bar has adequately alleged an equal protection claim.

### 3.2.2 COVID-19 Order No. 43 Violates Due Process

As with his equal protection argument, Defendant's due process argument is flawed in that he erroneously assumes Bit Bar does not have a fundamental right to provide its customers the use of video game machines. Bit Bar does not premise its claim on an economic liberty interest, but rather on the infringement of this fundamental First Amendment right.

Defendant argues Bit Bar was not entitled to any pre-deprivation due process due to the emergency nature of Defendant's response to the pandemic, relying on *Compagnie Francaise de Navigation a Vapeur v. Board of health of Sate of Louisiana*, 186 U.S. 380 (1902) and COVID-19 decisions that cited it. A crucial distinction here, however, is that Bit Bar is not challenging the first of Defendant's COVID-19 Orders. It may indeed have been necessary to close down non-essential businesses at the start of the pandemic, but that does not give Defendant free license to allow for re-openings in an arbitrary and discriminatory fashion. Unlike the cases Defendant cites in his Motion, here the necessity of snap decisions had been reduced by the time he issued COVID-19 Order No. 43. COVID-19 cases were going down and businesses were being allowed to reopen so long as they adhered to safety protocols. This is not a challenge to a broad shutdown order imposed to stop an impending spread of disease, but rather a challenge to a discriminatory order that allowed substantially similar businesses to reopen while Bit Bar remained closed. The same logic does not apply, and Bit Bar was owed due process. This process may not necessarily amount to a full evidentiary hearing and trial prior to Defendant taking action, but it must amount to something beyond the last-minute unilateral decisions of an unchecked executive.

## 4.0 CONCLUSION

For the foregoing reasons, the Court should deny Defendant's Motion to Dismiss in its entirety.

Dated: October 26, 2020

Respectfully Submitted,

/s/ Marc J. Randazza
Marc J. Randazza, BBO# 651477
mjr@randazza.com, ecf@randazza.com
Jay M. Wolman, BBO# 666053
jmw@randazza.com, ecf@randazza.com
RANDAZZA LEGAL GROUP, PLLC
30 Western Avenue
Gloucester, MA 01930
Tel: (978) 801-1776

Attorneys for Plaintiff
Boston Bit Labs, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on October 26, 2020.

/s/ Marc J. Randazza
Marc J. Randazza